IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY BAIER, | : | |
| | : | |
| Plaintiff | : | No. 4:07-CV-2236 |
| | : | |
| v. | : | (Judge McClure) |
| | : | |
| JERSEY SHORE STATE BANK, | : | |
| | : | |
| Defendant. | : | |

**M E M O R A N D U M**

August 31, 2009

**BACKGROUND:**

On December 7, 2007, plaintiff, Mary Baier, instituted this civil action against defendant, Jersey Shore State Bank ("JSSB" or the "Bank"). (Rec. Doc. No. 1). Baier later filed an amended complaint on August 19, 2008, setting forth a claim pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). (Rec. Doc. No. 14). In her one-part amended complaint, plaintiff contends that JSSB actively retaliated against her for engaging in a protected activity, culminating in her dismissal from JSSB.

Defendant asserts, inter alia, that plaintiff fails to establish a prima facie

1

case of retaliation, and that, even if she did, defendant has refuted the prima facie case with a non-pretextual, legitimate, non-discriminatory explanation for its action.  In addition, JSSB asserts counterclaims against plaintiff, contending that plaintiff breached a common law duty of confidentiality and loyalty, engaged in unfair competition with her employer, was unjustly enriched at JSSB's expense and tortiously interfered with the possible contractual relationships between JSSB and prospective clients.  (Rec. Doc. No. 12).

The parties have completed discovery.  On April 14, 2009, defendant filed its motion for summary judgment, (Rec. Doc. No. 24), accompanied by a statement of material facts ("SMF") (Rec. Doc. No. 25) and a supporting brief.  (Rec. Doc. No. 26).  Opposing, (Rec. Doc. No. 31),[1] and reply briefs, (Rec. Doc. No. 37), have been timely filed and plaintiff filed an answer to defendant's statement of

---

[1]A review of plaintiff's opposing brief reveals two disturbing trends.  First, plaintiff's counsel, in what appears to be an effort to sculpt a loquacious argument, abuses colloquialisms ad nauseam.  Though this court understands (and even enjoys) the occasional display of panache or the infrequent need for a rhetorical blaze to emphasize an important point, plaintiff's counsel abandons all too frequently the formalism necessary to communicate his argument efficiently.   A concise, straightforward and formal writing style remains the most appropriate vehicle for communicating a legal argument.

Secondly, the practice of law, governed by historical axioms, demands that attorneys representing opposing parties treat each other with professionalism and respect.  Regardless of plaintiff's counsel's thoughts regarding the opposition's legal argument, he should never refer to her contentions as "nothing more than 'a tale, told by an idiot . . . .'" (Rec. Doc. No. 31, p. 13) (citation omitted).

facts (Rec. Doc. No. 32). The matter is ripe for disposition. In response to plaintiff's SMF, defendant filed a motion to admit defendant's SMF or strike portions of plaintiff's SMF.[2] (Rec. Doc. No. 38). The appropriate briefs were timely filed. See (Rec. Doc. No. 39; Rec. Doc. No. 44; Rec. Doc. No. 46). For the following reasons, we will grant defendant's motion for summary judgment in part and deny defendant's motion in part. Defendant's motion to admit defendant's SMF or strike portions of plaintiff's SMF will be denied.

Defendant's two outstanding motions in limine (Rec. Docs. Nos. 35 and 40) will be ruled upon in separate orders.

---

[2]Defendant claims that plaintiff's SMF "contains numerous inflammatory factual assertions without citation to any record evidence, clear misrepresentations of the record evidence, legal conclusions and/or pure argument" in violation of L.R. 56.1. (Rec. Doc. No. 38, p. 2). Defendant also correctly notes that we may, but are not required to, grant its motion. See (Id. at p. 4).

Although we recognize that portions of a number of paragraphs included in plaintiff's SMF are improper, those paragraphs also contain poignant information. Traditionally, in situations such as this, it is not the practice of this Court to strike a party's SMF, either in whole or in part, or admit the opposition party's SMF wholesale. Instead, in evaluating motions for summary judgment, we glean what useful information we can from the parties' SMFs and disavow improper or unsupported entries, or portions thereof. In fairness, it is important to note that defendant's SMF also contains argument, misrepresentation and, in some cases, statements that are clearly unsubstantiated by the record.

Therefore, having reviewed plaintiff's SMF and found that it facilitates the court's consideration of the summary judgment motion, we shall adhere to our traditional practice and deny defendant's motion to strike plaintiff's SMF or admit its SMF.

**DISCUSSION:**

## I. <u>Standard of Review</u>

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit.  <u>Id.</u>; <u>Justofin v. Metropolitan Life Ins. Co.</u>, 372 F.3d 517, 521 (3d Cir. 2004).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 706 (3d Cir. 1989) (quoting <u>Chippolini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d. Cir. 1987)); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When the moving party bears the burden of persuasion at trial, it must point to evidence in the record that supports its version of all material facts and

demonstrate an absence of material facts to the contrary.  <u>National State Bank v. Federal Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  If the moving party does not meet this burden, the court must deny summary judgment even if the nonmoving party does not produce any opposing evidence.  <u>Id.</u>

In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party.  <u>Am. Flint Glass Workers Union v. Beaumont Glass Co.</u>, 62 F.3d 574, 578 (3d Cir. 1995).  The nonmoving party, however, cannot defeat a motion for summary judgment by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that demonstrates that there is a genuine issue as to a material fact.  <u>See</u> <u>Celotex</u>, 477 U.S. at 321; <u>Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999).

## II.  <u>Statement of Facts</u>

Plaintiff is a woman who began working for the defendant on or about December 9, 1974.  (Rec. Doc. No. 14, p. 2, ¶ 10; Rec. Doc. No. 25, p. 2, ¶ 2).  Baier's employment with JSSB came to a conclusion in December 2006.  (Rec. Doc. No. 25, p.2, ¶ 3).  At different times during her employment, Baier served as an Assistant Branch Manager, Individual Retirement Accounts ("IRA")

Coordinator, Licensed Insurance Representative and Lead Teller and Customer Service Representative. (Rec. Doc. No. 25, pp. 2-3, ¶¶ 3-8; Rec. Doc. No. 32, pp. 1-2, ¶¶ 3-8).

As a condition of employment, on a yearly basis Baier reviewed and signed a statement that she understood and would abide by JSSB's Code of Corporate Conduct and Conflict of Interest policies. (Rec. Doc. No. 25, pp. 3-4, ¶¶ 12, 15; Rec. Doc. No. 32, p. 2, ¶¶ 12, 15). According to the Code of Corporate Conduct, employees were considered representatives of the bank when dealing with external organizations, (Rec. Doc. 33-8, p. 2), and were to, inter alia, avoid situations in which their personal interests and the interests of the bank would conflict. (Rec. Doc. No. 25, p. 3, ¶ 13; Rec. Doc. No. 32, p. 2, ¶ 13). JSSB's interests and those of its shareholders took precedence over an employee's private interests and the employee was to act in the best interests of the bank when dealing with current or potential customers. (Rec. Doc. 33-8, p. 3). Similarly, the Conflict of Interest Policy noted that employees should "avoid situations that create an actual or perceived conflict between their personal interests and those of the organization." (Rec. Doc. No. 33-9, p. 2.). Although employees could have outside business interests under this policy, they were barred from engaging in activities that would bring them in competition with JSSB or adversely affect the organization or the

employee's job performance.  (Rec. Doc. No. 25, p. 4, ¶ 14; Rec. Doc. No. 32, p. 2, ¶ 14, Rec. Doc. No. 33-9, p. 2).  Employees were also prohibited from using "proprietary and/or confidential information for personal gain or to the organization's detriment, nor may they use assets or labor for personal use."  (Rec. Doc. No. 33-9, p. 2).  JSSB, who possessed the sole discretion to determine if a conflict existed under the policy, could ask the employee to resign if it determined the conflict was severe enough.  (Id. at pp. 2-3).

On or about May 8, 2001, Baier attended a Limestone Township zoning meeting wherein she protested the proposed residential development advanced by one of JSSB's customers.  (Rec. Doc. No. 25, p. 4, ¶ 16; Rec. Doc. No. 32, p. 2, ¶ 16).  On or about May 15, 2001, when JSSB's management became aware of the incident, Baier was told that she should refrain from such activities.  (Rec. Doc. No. 32, p. 2, ¶ 18); see (Rec. Doc. No. 27-6, p. 2).  Baier met with JSSB's Vice President of Branch Operations, Robert Glunk, and JSSB's Human Resources Director, JoAnn DiPasquale, on May 21, 2001, to discuss JSSB's and Baier's positions on the Limestone Township issue.  (Rec. Doc. No. 25, p. 5, ¶ 19; Rec. Doc. No. 32, p. 2, ¶ 19; Rec. Doc. No. 27-6, p. 2).  JSSB reiterated its previously articulated position at that time.  (Rec. Doc. No. 32, p. 3, ¶ 20).  However, Baier

was not disciplined for her conduct.[3]  (Rec. Doc. 25, p. 5, ¶ 21; Rec. Doc. 32, p. 3, ¶ 21).

On or about October 21, 2003, Baier was admonished for violating bank policy after she transferred money out of her sister's account, (Rec. Doc. No. 25, p. 5, ¶¶ 22-23; Rec. Doc. No. 32, p. 3, ¶¶ 22-24), and a written reprimand was placed in Baier's employment file.  (Rec. Doc. No. 32, p. 3, ¶ 25).

On or about January 5, 2006, Baier notified JSSB President Ronald Walko that she was concerned she was being discriminated against by the Bank on the basis of age, gender and disability, and that she intended to file a complaint with the Equal Employment Opportunity Commission ("EEOC").  (Rec. Doc. No. 25, p. 14, ¶ 95; Rec. Doc. No. 32, p. 11, ¶ 95).  Several weeks later, on or about January 23, 2006, Baier informed JSSB that she would begin a home-based title and licensure-related business.  (Rec. Doc. No. 25, p. 6, ¶ 28; Rec. Doc. No. 32, p. 3, ¶ 28).  Baier also indicated that she would provide financial, tax and notary services to her clients.  (Rec. Doc. No. 25, p. 6, ¶ 28; Rec. Doc. No. 32, p. 3, ¶ 28).  Although the notary designation and the powers thereto belong to the individual, Baier was advised that JSSB did not intend for its notaries to sell services to

---

[3]Although plaintiff denies that she was not disciplined, she admits that the attempts to discipline her were squashed before they were realized.

outside customers. (Rec. Doc. No. 25, p. 7, ¶ 38; Rec. Doc. No. 32, p. 4, ¶ 38). Walko also noted that Baier should reread the Code of Corporate Conduct and Conflict of Interest policies and reconsider their applicability to Baier's business and suggested that JSSB would further investigate her personal business as a possible conflict of interest. See (Rec. Doc. No. 27-3, pp. 20-21; Rec. Doc. No. 27-5, pp. 6-10; Rec. Doc. No. 33-12, p. 2). Baier purported that all financial service customers were signing letters confirming they were not solicited at the Bank. (Rec. Doc. No. 25, p. 6, ¶ 31; Rec. Doc. No. 32, p. 4, ¶ 31). This assurance was never fulfilled. (Rec. Doc. No. 27-3, pp. 36-37). However, at that time, Baier was not disciplined, demoted or prevented from engaging in her personal business by JSSB. (Rec. Doc. 25, p. 8, ¶¶ 40-42; Rec. Doc. No. 32, p. 5, ¶¶ 40-42).

On or about March 21, 2006, Baier retained counsel to assist in her filing charges with the EEOC, (Rec. Doc. No. 25, p. 15, ¶ 98; Rec. Doc. No. 32, p. 11, ¶ 98). In or around this time, Baier reinstated her insurance sales license with a broker that was not associated with the Bank. (Rec. Doc. No. 25, p. 8, ¶ 44; Rec. Doc. No. 32, p. 6, ¶ 44). Soon thereafter, on April 10, 2006, Baier filed a complaint with the EEOC charging the JSSB with discriminating against her on the basis of wages, sex and age and that she was experiencing an ongoing pattern of retaliation. (Rec. Doc. No. 25, p. 15, ¶¶ 99-100; Rec. Doc. No. 32, p. 11, ¶¶ 99-

100; Rec. Doc. No. 33-10, p. 2-20). A Notice of Right to Sue was issued by the EEOC on September 14, 2007. (Rec. Doc. No. 25, p. 15, ¶ 102; Rec. Doc. No. 32, p. 11, ¶ 102).

On or about May 5, 2006, the Bank's security officer questioned Baier regarding suspicious activity on a customer's account. (Rec. Doc. No. 25, p. 11, ¶ 67; Rec. Doc. No. 32, p. 8, ¶ 67). Baier altered the customer's account information, supplanting the customer's address with her own. (Rec. Doc. No. 25, p. 11, ¶ 68; Rec. Doc. No. 32, p. 8 ¶ 68). Baier contended that she changed the address because the customer was involved in divorce proceedings and needed the statements delivered elsewhere. (Rec. Doc. No. 25, p. 11, ¶ 70; Rec. Doc. No. 32, p. 8, ¶ 70). Baier was not disciplined for this conduct. (Rec. Doc. No. 25, p. 11, ¶ 73; Rec. Doc. No. 32, p. 8, ¶ 73).

At or around this time, it was brought to JSSB's attention that Baier had installed a sign in front of her home advertising Nippenose Valley Financial Services ("NVFS"). (Rec. Doc. No. 25, p. 8, ¶ 45; Rec. Doc. No. 32, p. 6, ¶ 45). The sign stated that Baier offered mutual fund, 401(k), IRA, pension, annuities, health and life insurance and other financial services, in direct competition with the Bank. (Rec. Doc. No. 25, p. 8, ¶ 46; Rec. Doc. No. 32, p. 6, ¶ 46). The Bank subsequently hired an investigator, Charles Duchman, to obtain information

regarding whether Baier was competing with the Bank. (Rec. Doc. No. 25, p. 9, ¶ 50).

On August 9, 2006, Duchman called the telephone number Baier listed on the sign and left a message. (Id. at p. 9, ¶ 53; Rec. Doc. No. 32, p. 6, ¶ 53). Baier returned his call that evening, requesting that Duchman call her back during business hours at the JSSB Montgomery Branch. (Rec. Doc. No. 25, p. 9, ¶ 54; Rec. Doc. No. 32, p. 6, ¶ 54). The next day, Duchman called Baier at work to inquire about the financial services she could provide regarding funds he previously invested in an annuity and mutual fund portfolio. (Rec. Doc. No. 25, p. 10, ¶ 55; Rec. Doc. No. 32, p. 6, ¶ 55). On August 21, 2006, Baier visited Duchman at his home with George Albertson, one of JSSB's competitors, to review Duchman's investment portfolio. (Rec. Doc. No. 25, p. 10, ¶ 58). Prior to this point, Baier never suggested that Duchman use JSSB's financial services, nor did she refer him to any of the Bank's financial services representatives. (Rec. Doc. No. 25, p. 10, ¶¶ 57, 59, 61; Rec. Doc. No. 32, pp. 6-7, ¶¶ 57, 59, 61).

It was around this time that Baier's medical status required her to reduce her hours to twenty per week. (Rec. Doc. No. 32, p. 8, ¶ 74). And, on or about November 27, 2006, Baier, unaware that Glenda Nelson was the secretary to one of JSSB's Board Members, (Rec. Doc. No. 27-8, p. 24), sent Nelson a note stating

that she would "be leaving the Bank after 31 years." (Rec. Doc. No. 25, p. 10, ¶ 63; Rec. Doc. No. 32, p. 7, ¶ 63; Rec. Doc. No. 33-15, p. 2). She further stated that she was starting her own business and included a business card for NVFS. (Rec. Doc. No. 33-15, p. 2). To this end, she later marketed services to Kenneth Ertel with Albertson's assistance, though she recognized that JSSB had products, services and representatives which could address Ertel's needs. (Rec. Doc. No. 27-3, p. 34-36).

Shortly after Nelson received Baier's note, the note was transmitted to Walko through JSSB's counsel. (Rec. Doc. No. 25, p. 12, ¶ 80). In response to this note, JSSB's counsel contacted Baier's counsel, via a letter dated November 27, 2009, to notify her that JSSB accepted Baier's resignation, (Rec. Doc. No. 33-14, p. 9), and, sometime later in December 2006, JSSB's counsel advised Walko that Baier was resigning. (Rec. Doc. No. 25, p. 12, ¶ 77). Baier's counsel believed, but did not specifically recall, that she responded to JSSB's counsel's letter in order to quash the belief that Baier was resigning. (Rec. Doc. No. 33-6, pp. 18-22).

On or about December 13, 2006, Baier, with her counsel's assistance, prepared a letter to Walko stating that she was tendering her resignation effective December 15, 2006, because she could no longer work for the Bank as a result of

perceived discrimination.  (Rec. Doc. No. 25, p. 12, ¶¶ 78-79; Rec. Doc. No. 25, p.

9, ¶¶ 78-79).  The letter, however, was never delivered.  (Rec. Doc. No. 32, p. 9, ¶

79).  That same day, both counsel discussed Baier's situation via telephone.  (Rec.

Doc. No. 25, p. 13, ¶ 85; Rec. Doc. No. 32, p. 9, ¶ 85).  The following day, JSSB's

counsel faxed Baier's counsel a letter referencing the telephone conversation of

December 13, 2006 and noting that Baier's last day of employment, as a result of

her "voluntary resignation," would be December 23, 2006.  (Rec. Doc. 33-14, p.

11).  Baier's counsel responded the same day, thanking JSSB's counsel for his

letter and stating that it was Baier's "preference not to continue to go to the bank .

. . ."  (Id. at p. 10).  However, she indicates that these communications were part of

an attempt to settle the case as a whole, and that Baier never intended to resign

from JSSB and such intent could not be gleaned from the settlement discussions.

(Rec. Doc. No. 33-6, pp. 30-40).

### III. <u>Plaintiff's Retaliation Claim</u>

### A. <u>Ripeness</u>

Defendant contends that summary judgment should be granted regarding

Baier's retaliation claim because she failed to exhaust her administrative remedies

as to this claim.  JSSB argues that the administrative remedies were not exhausted

because the allegations Baier filed with the EEOC did not include an allegation

that JSSB terminated her employment in retaliation for her complaints of discrimination.

In response, plaintiff claims that she appropriately covered the alleged retaliation in question by charging JSSB with an ongoing pattern of retaliation and indicated, in a questionnaire filed in February 2007, that the pattern of retaliation included discharge and the charge was being amended to reflect that.

A plaintiff making a claim for retaliation under Title VII of the Civil Rights Act of 1964, as amended, must first pursue administrative remedies, before filing a claim in federal district court.  <u>Love v. Pullman Co.</u>, 404 U.S. 522, 523 (1972).  A suit may be filed in federal court only after plaintiff receives a right-to-sue notice, indicating that all administrative remedies have been exhausted.  <u>Burgh v. Borough Council of Borough of Montrose,</u> 251 F.3d 465, 470-71 (3d Cir. 2001).

Although it is true that Baier's original EEOC filing did not specifically claim that her employment was terminated in retaliation for filing her claim, Baier notes that a charge may be amended to include "additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge" and that such an amendment "will relate back to the date the charge was first received."  29 C.F.R. § 1601.12(b).  Consequently, the Discharge Questionnaire Baier filed on February 1, 2007, which propagates plaintiff's

allegation that her employment was terminated by defendant in December 2006 as a result of the complaint filed with the EEOC in April 2006, effectively amends the original charge because it is "sufficiently precise to identify the parties, and to describe generally the actions or practices complained of." Id. Moreover, it is abundantly clear that the subject matter of the retaliation addressed in the questionnaire and the original charge are closely related.

Therefore, plaintiff properly exhausted her administrative remedies regarding the present claim and her complaint shall proceed.

## B. Prima Facie Case

Plaintiff claims she was fired because she filed a complaint with the EEOC in April 2006. Retaliation claims under Title VII proceed in the familiar three stages set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). First, the plaintiff must provide sufficient evidence to establish a prima facie case of discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999). Second, if plaintiff succeeds in doing so, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Id. (citing McDonnell Douglas Corp., 411 U.S. at 802). Finally, if the defendant carries this burden, then the plaintiff must prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant are not true but rather act as mere

pretext for the discrimination.  Id. (citation omitted).  To establish a prima facie

case, the plaintiff must demonstrate that: (1) she engaged in protected activity; (2)

the employer took adverse employment action against her; and (3) there was a

causal connection between the protected activity and the adverse employment

action.  Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

There is no doubt that plaintiff was engaged in a protected activity.  See

Moyer v. Kaplan Higher Educ. Corp., 413 F. Supp. 2d 522, 526 (E.D. Pa. 2006).

Therefore, we begin our examination with the second prong of the test.

## 1. **Adverse Employment Action**

### a. Inconsistent Theories of the Case

Both parties contend that the opposition is estopped from pleading

inconsistent, diametrically opposite theories of the case.  JSSB avers that Baier

may only assert that she was actually discharged or constructively discharged, not

that she may have experienced one or the other, in establishing an adverse

employment action.  Similarly, Baier claims that JSSB may not argue that Baier

resigned because, on appeal in an unemployment compensation matter, the Bank

took the position that Baier was terminated for wrongful misconduct.  We find

neither argument moving and will permit the parties to argue their cases in any

manner they choose.

In attacking plaintiff's pleading, defendant cites a litany of cases in which courts rejected one discharge theory over another inconsistent one. However, these courts did not hold that inconsistent theories may not be initially argued. This is because Rule 8 of the Federal Rules of Civil Procedure permits inconsistency in both legal and factual allegations. Fed. R. Civ. P. 8; see W.V. Realty, Inc. v. Northern Ins. Co., 334 F.3d 306, 316 (3d Cir. 2003) (citing Indep. Enters. Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165, 1175 (3d Cir. 1997)); see also United Technologies Corp. v. Mazer, 556 F.3d 1260, 1273-74 (11th Cir. 2009) (quoting Fed. R. Civ. P. 8); Kruse v. Wells Fargo Home Mortg., Inc., 383 F.3d 49, 55 (2d Cir. 2004) (citing Fed. R. Civ. P. 8); Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1555 (1st Cir. 1994); but see Tamayo v. Blagojevich, 526 F.3d 1074, 1086 (7th Cir. 2008) (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805 (1999)) (holding that the "pleading rules do not tolerate factual inconsistencies in a complaint"). Therefore, plaintiff is permitted to assert that she was actually or constructively discharged in the same case.

Plaintiff's assertion that defendant may not argue that she resigned because defendant previously claimed that plaintiff was fired for cause is couched in the

idea that a party is precluded "from assuming a position in a legal proceeding inconsistent with one previously asserted." <u>Oneida Motor Freight, Inc. v. United Jersey Bank</u>, 848 F.2d 414, 419 (3d Cir. 1988) (citing <u>Scarano v. Central Railroad Co.</u>, 203 F.2d 510 (3d Cir. 1953)).  Under this theory, the court may properly prevent a litigant from arguing a position that is inconsistent with one the litigant has previously advanced before a court or agency.  <u>Montrose Medical Group Participating Savings Plan v. Bulger</u>, 243 F.3d 773, 779 (3d Cir. 2001).

"The basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  <u>Ryan Operations G.P. v. Santiam-Midwest Lumber Co.</u>, 81 F.3d 355, 358 (3d Cir. 1996).  "Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be."  <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.</u>, 337 F.3d 314, 319 (3d Cir. 2003) (citing <u>In re Chambers Development Co., Inc.</u>, 148 F.3d 214 (3rd Cir. 1998)).  In <u>Montrose Medical Group</u>, the United States Court of Appeals for the Third Circuit outlined criteria to be used in determining when application of this doctrine is justified.  The court concluded:

>   First, the party to be estopped must have taken two positions

that are irreconcilably inconsistent. Second, judicial estoppel is
unwarranted unless the party changed his or her position "in
bad faith-i.e., with intent to play fast and loose with the court."
Finally, a district court may not employ judicial estoppel unless
it is "tailored to address the harm identified" and no lesser
sanction would adequately remedy the damage done by the
litigant's misconduct.

243 F.3d at 779-80 (citations omitted). The court must also provide "the party to

be estopped a meaningful opportunity to provide an explanation for its changed

position. Krystal, 337 F.3d at 320 (citing Montrose Medical Group, 243 F.3d at

780.).

With this in mind, we turn to JSSB's alleged inconsistent arguments.

A review of the record reveals that defendant adopted, see (Rec. Doc. No.

33-17, pp. 5-12), and was successful, with a termination for cause argument on

plaintiff's appeal from the Unemployment Compensation Board of Review's

("UCBR") decision. See (Rec. Doc. No. 33-17, pp. 14-20). Obviously,

defendant's present argument that it did not actually discharge plaintiff is

irreconcilable with the termination for cause argument it adopted during the

appeal. However, we find plaintiff's argument mildly disingenuous, because Baier

conveniently omits that defendant argued at the initial unemployment

compensation hearing that she voluntarily resigned. See (Rec. Doc. No. 27-8, p.

10). As such, this court cannot say that defendant is arguing inconsistent positions

in bad faith.

The Commonwealth Court's scope of review of a UCBR decision is limited to determining whether any of the parties' "constitutional rights were violated, whether an error of law was committed and whether the findings of fact are supported by substantial evidence." Pettyjohn v. UCBR, 863 A.2d 162, 164 (Pa. Commw. Ct. 2004) (citing 2 Pa.C.S. § 704; Graham v. Unemployment Compensation Board of Review, 840 A.2d 1054 (Pa. Commw. Ct. 2004)). Therefore, defendant was essentially forestalled from renewing its original assertion on appeal. At that point, JSSB could either handcuff itself to the USBR's decision and argue in favor of its validity, as one would expect, or permit plaintiff's appeal to proceed unopposed. We find that it would be incredibly unreasonable to punish JSSB for selecting the former, especially since we hardly consider the latter a legitimate option. As previously discussed, bad faith in this context exists where a party's "intent [is] to play fast and loose with the court," Montrose Medical Group, 243 F.3d at 779 (citation omitted), and we can find no evidence that defendant intended to or inadvertently acted in that fashion. Having found the defendant did not act in bad faith, we find it inappropriate to judicially estop JSSB from arguing that it did not terminate Baier's employment, despite championing that theory on plaintiff's appeal from the UCRB. Therefore, we need

not delve any further into plaintiff's judicial estoppel argument.

## b. Actual Discharge

Defendant argues that Baier cannot point to any evidence within the record to support the contention that she was actually discharged by JSSB.  In response, plaintiff directs us, in large part, to the discussions between the parties' counsel to demonstrate that she did not resign from JSSB, but was, in fact, fired.  After a thorough review of the record, we find that the amount of evidence supporting both actual and constructive termination serves to preserve a genuine issue of material fact.[4]

The Bank stresses that Baier's termination stems solely from its reliance on representations from Baier and her counsel.  However, JSSB's reliance upon the note Baier sent to Nelson, in which Baier indicated a desire to resign, is of little import because Baier was unaware that Nelson was connected to JSSB and therefore did not submit a resignation to JSSB.  Moreover, Baier's counsel testified at her deposition that, after JSSB's counsel accepted Baier's "de facto"

---

[4]Although this case focuses on alleged retaliation, not unemployment compensation, and the evidence is reviewed de novo, we would be remiss if we did not note that the unemployment compensation hearing officer, the UCBR and the Commonwealth Court determined that this case was accompanied by a substantial evidence indicative of termination for cause.  See (Rec. Doc. No. 33-17, pp. 14-21, 23-24).  We find their reasoning applicable in the case at bar.

resignation and inquired about scheduling Baier's final day of work, she repeatedly told JSSB's counsel that Baier had no interest in resigning absent a settlement of her EEOC claim. Examining defendant's counsel's letters, one could reasonably detect a certain desire to expediently end Baier's employment. Additionally, after JSSB repeatedly inquired about her resignation, Baier only indicated that she did not wish to return to work as a result of the alleged repeated retaliation. Therefore, viewing this evidence in the light most favorable to the plaintiff, one could reasonably determine that JSSB seized an opportunity to terminate Baier's employment for cause, under the guise of resignation, and that defendant formally discharged plaintiff on December 15, 2006 when it stated that JSSB "[had] disabled Ms. Baier from all computer systems and she need not show up at the Bank any further," (Rec. Doc. No. 33-14, p. 14). See Chinn v. Pennsylvania, 462 A.2d 1250, 1252 (Pa. Commw. Ct. 1981) (employer need not use words such as 'fired' or 'discharged' but language must exhibit both immediacy and finality); see also Putnam v. Lower, 236 F.2d 561, 566 (9th Cir. 1956) (holding that discharge of an employee need not be accompanied by formal words of firing, but rather "[w]ords or conduct which would logically lead a prudent person to believe his tenure had been terminated are in themselves sufficient"); Monroe v. Penn-Dixie Cement Corp., 335 F. Supp. 231, 233 (N.D.

Ga. 1971) ("A discharge occurs when there are any acts or words which show a clear intention on the part of the employer to dispense with the services of the employee and which are the equivalent to a declaration that the services will no longer be accepted.") (citing <u>Taylor v. Tulsa Tribune Co.</u>, 136 F.2d 981, 983 (10th Cir. 1943)); <u>Jackson v. Minidoka Irrigation Dist.</u>, 563 P.2d 54, 58-59 (Idaho 1977) (citing <u>Hannifin v. Retail Clerks International Ass'n</u>, 511 P.2d 982 (Mont. 1973); <u>Colorado Civil Rights Comm'n v. State School Dist. No. 1</u>, 488 P.2d 83 (Co. App. Ct. 1971)).

Having concluded that a genuine issue of material fact exists regarding actual discharge, we need not address plaintiff's constructive discharge claim.

### 2. <u>Causal Connection Between Protected Activity and the Adverse Employment Action</u>

Assuming, <u>arguendo</u>, that a reasonable jury found that the plaintiff experienced an adverse employment action, either through outright termination or constructive discharge, plaintiff must still demonstrate a causal connection between the protected activity and the adverse employment action. <u>Kachmar</u>, 109 F.3d at 177. To demonstrate a causal link between the protected activity - filing the EEOC complaint - and the adverse employment action - her employment termination, plaintiff can rely on (1) the timing of the adverse action or (2)

evidence of ongoing antagonism.  Abramson v. William Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period").  Plaintiff may rely solely on evidence of temporal proximity between the filing of the complaint and the adverse employment action taken against her as long as such evidence is "unusually suggestive of retaliatory motive."  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n. 9 (3d Cir. 2003) (citations omitted).  Evidence of ongoing antagonism may include evidence of other retaliatory acts or other evidence from the record that can infer causation.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

Although no equation has been formulated to determine what is considered too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (three months between filing and adverse employment action insufficient to establish causation element of employee's Title VII retaliation action); Walsh v. Wal Mart Stores, Inc., 200 Fed. Appx. 134, 136 (3d Cir. 2006) (eight-month gap between filing of EEOC claim

and adverse employment action insufficient to establish causation); Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (two-months between filing and adverse employment action too long to permit inference of causation); Morrissey v. Luzerne County Community College, 117 Fed. Appx. 809, 816 (3d Cir. 2004) (six-month duration not unusually suggestive). As such, the significant eight-month gap between the filing of the EEOC complaint and the conclusion of Baier's employment forestalls any serious consideration that JSSB harbored a retaliatory motive, at least from a temporal proximity perspective. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) ("[T]he mere fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy plaintiff's burden of demonstrating a causal link between the two events.").

Regarding ongoing antagonism, plaintiff claims that "[d]efendant has not challenged anything but the discharge, and therefore, to the extent JSSB had not challenged ongoing retaliation, this Complaint must survive. Nevertheless, [p]laintiff has already presented sufficient evidence of causation to proceed." This statement lacks merit. As evidence of retaliation, plaintiff avers that "not only had [Baier] filed an EEOC complaint nearly a year before [her termination], but there had been ongoing negotiations and tensions, letters exchanged, etc. as a result."

While it may certainly be true that a tense relationship existed between JSSB and Baier that inevitably resulted in her employment at JSSB coming to a conclusion, there is no evidence to suggest that an adverse employment action arose in response to Baier's complaint, or even that she received harsher treatment after the complaint was filed. Beyond the parties' infrequent meetings regarding Baier's business and defendant's investigating the possibility that Baier was cultivating a conflict of interest, there is negligible evidence of an acrimonious relationship between the plaintiff and defendant. This is especially true, when one considers that JSSB did not interfere with Baier's personal business, despite suspicions that Baier was competing with JSSB. In fact, the only official disciplinary action the defendant took against the plaintiff was a written reprimand filed in 2003, several years before the EEOC complaint was filed. Courts have only found the existence of ongoing antagonism to the extent necessary to establish causation in very limited circumstances which are inapplicable here. See, e.g., Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (holding that a "pattern of antagonism" existed because the employer engaged in a "constant barrage of written and verbal warnings . . . , inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge").

Plaintiff has failed to point to a scintilla of evidence which can establish a casual link between her alleged adverse employment action and the EEOC complaint. And, we find it unnecessary to aimlessly scour the record on our own volition to corroborate Baier's theories. Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record."). Establishing all the elements of a prima facie case is the plaintiff's burden. Theories and bald assertions do not rise to the level of substantial evidence for purposes of defeating a motion for summary judgment. See Celotex Corp., 477 U.S. at 322-23.

At best, Baier can only demonstrate that JSSB began officially considering Baier's future with the Bank after Baier transmitted a note to the employee of a board member indicating that she intended to resign. Moreover, there is no evidence to suggest that the disagreement between counsel about Baier's possible resignation is, in any way, related to plaintiff's EEOC complaint. What is clear is that any alleged adverse employment action in this case is a "discrete response to a particular occurrence" which bears no relationship to any alleged pattern of antagonism stemming from plaintiff's protected activity. Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001). Even if, as plaintiff claims, defendant used Baier's and her counsel's various letters indicating that Baier wished to end her

employment with JSSB as an excuse to terminate Baier's employment, JSSB's actions would still qualify as responses to the letters and actions related thereto, not to the EEOC claim. That JSSB might have been mistaken about Baier's true intentions is not dispositive. See EEOC v. Rite Aid Corp., No. 03-CV-777-GMS, 2005 WL 3434779, at *4 (D. Del. Dec. 12, 2005) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d. Cir. 1994)).

Therefore, for the forgoing reasons, we conclude that plaintiff has not established a prima facie case of retaliation because she did not demonstrate that a reasonable jury could find a casual connection between her filing an EEOC complaint and the alleged adverse employment action. No genuine issue of material fact exists and defendant is entitled to summary judgment on the claim of retaliation.

## IV. **Defendant's Counterclaims**

### A. Breach of Fiduciary Duty - Count I

Defendant avers that plaintiff breached her duty of loyalty to the Bank when, acting as an Assistant Branch Manager and the Bank's agent, she attempted to divert business away from the Bank during her period of employment. In contrast, plaintiff claims that she was a lead teller during the relevant period of time and therefore owed no duty to JSSB because she was not her employer's

agent.

The common-law agency doctrine is comprised of three elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and, (3) the understanding of the parties that the principal is to be in control of the undertaking. Basile v. H & R Block, Inc., 761 A.2d 115, 1120 (Pa. 2000). In Pennsylvania, it is well settled that employees' titles are irrelevant with regards to agency; all employees are agents of their respective employers. Crown Coal & Coke Co. v. Compass Point Resources, LLC, Civ. No. 07-1208., 2009 WL 891869, at *5 (W.D. Pa. Mar. 31, 2009) (citing Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003)); Binswanger of Pennsylvania, Inc. v. Tru Serv Corp., Civ. No. 00-4816, 2003 WL 22429059, at *5 (E.D. Pa. May 21, 2003). Therefore, since no evidence presented indicates that Baier was not a JSSB employee, there can be no question that she was the Bank's agent at all times relevant to this action. As such, she owed JSSB a fiduciary duty of loyalty "to act only for [JSSB's] benefit" in all matters connected with her agency. Basile, 761 A.2d at 1120 (citations omitted). To establish a breach of the fiduciary duty of loyalty, "a plaintiff must demonstrate that his agent acted for a person or entity whose interests conflicted with the plaintiff." Reading Radio, 833 A.2d at 211 (citing Restatement (Second) of

Agency § 394 (1958)).

JSSB argues that Baier breached her fiduciary duty in a multitude of ways. First, JSSB claims that Baier breached her duty when she provided notary services outside of the scope of her employment. We are not moved by this argument. As JSSB recognized, the notary's license belongs to the notary and may be used in any manner permissible under the law.

Secondly, the Bank contends that Baier violated her duty when she funneled Duchman, who had contacted her to inquire about financial services regarding an annuity and mutual fund portfolio, to Albertson, one of JSSB's competitors. Baier argues that she violated no duty because she was required to forward Duchman's inquiry onto Albertson under the rules promulgated by the National Association of Securities Dealers ("NASD") because Duchman was Albertson's client in the past. (Rec. Doc. No. 33-2, p. 7-8). Nevertheless, plaintiff neither provides the court with the rule(s) in question nor directs us to where we might find the authority to support her claim. We find it impossible for us to ascertain how there might be a genuine issue of material fact when Baier has failed to point to anything to justify her conclusion, nor is it our responsibility to search for that justification <u>sua sponte</u>. <u>See</u> <u>Doebler</u>, 442 F.3d at 820. Therefore, her justification argument is an unfounded legal conclusion, and we must examine her actions without lending

credence to the alleged NASD rules or her claim.

After Duchman contacted Baier to inquire about the financial services she could provide, Baier left Duchman a message to call her back at JSSB. When Duchman returned Baier's phone call, she had a duty, in the very least, to provide him with background information illustrating the financial services that JSSB could supply. Instead, however, Baier used JSSB resources to schedule an appointment for Duchman with NVFS and requested that Albertson accompany her to that meeting. Clearly, absent substantiated justification, Baier's misuse of company resources, directing a potential JSSB client to her own, competing financial services company and referring a potential JSSB client to another competitor unequivocally violated JSSB's Conflict of Interest Policy, (see Rec. Doc. No. 33-9, p. 2), and qualify as breaches of her duty of loyalty. See SHV Coal, Inc. v. Continental Grain Co., 545 A.2d 917, 921 (Pa. Super. Ct. 1988) (holding that employee's efforts to divert customer from employer to a competitor was a clear violation of the employee's duty of loyalty), rev'd on other grounds, 587 A.2d 702 (Pa. 1991).

Finally, JSSB asserts that Baier violated her duty of loyalty by marketing financial services, with the assistance of Albertson, to Ertel. We agree. Plaintiff's claim that Baier could not breach her duty in this instance because Ertel was a

potential JSSB customer only in the sense that every person is a potential JSSB customer is a non-sequitur. Whether Ertel considered using JSSB to address his financial needs is immaterial; Baier readily admits that JSSB had products, services and representatives which could have addressed Ertel's needs. Therefore, as a JSSB employee, she was required to place JSSB's interests before her own by informing Ertel of JSSB's services and notifying JSSB of Ertel's initial contact.

For the aforementioned reasons, defendant is entitled to summary judgment, as to liability, on this claim.

## B. Unfair Competition - Count II

JSSB contends that plaintiff violated Pennsylvania tort law when she solicited customers away from the bank and misused JSSB resources to schedule appointments for NVFS. Plaintiff counters, claiming that tortious unfair competition is inapplicable in this context.

According to the Third Circuit, "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival." Scanvec Amiable Ltd. v. Chang, 80 Fed. Appx. 171, 180 (3d Cir. 2003) (citing Pennsylvania State Univ. v. Univ. Orthopedics, Ltd., 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998)) ("The gist of the

action lies in the deception practiced in 'passing off' the goods of one for that of another."). However, in recent years, Pennsylvania courts, including this one, have examined unfair competition in light of the Restatement (Third) of Unfair Competition § 1 (1995) (hereinafter "Restatement). See e.g. Binary Semantics Ltd. v. Minitab, Inc., No. 4:07-CV-1750, 2008 WL 763575,

at * 8 (M.D. Pa. Mar. 20, 2008) (McClure, J.); Babiarz v. Bell Atl.-Pa., Inc., No. 1863, 2001 WL 1808554, at *9 (Pa. Com. Pl. July 10, 2001); Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc., No. 1994-2166. 1995 WL 842000, at *1-2 (Pa. Com. Pl. Oct. 18, 1995). According to the Restatement, several specific categories of commercial behavior that give rise to a claim of unfair competition include: (1) deceptive marketing, (2) infringement of trademark and other protectable intellectual property rights, (3) misappropriation of trade secrets and other intangible trade values, and (4) acts or practices that are actionable under federal or state statutes. Restatement § 1. The Restatement also notes that "[o]ne who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . other acts or practices of the actor determined to be actionable as an unfair method of competition." Id. Clarifying

the motivation behind this residual provision, comment g states that:

> A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market. Certain recurring patterns of objectionable practices form the basis of the traditional categories of liability specifically enumerated in [§ 1]. However, these specific forms of unfair competition do not fully exhaust the scope of statutory or common law liability for unfair methods of competition, and [the Restatement] therefore includes a residual category encompassing other business practices determined to be unfair.

Id. at cmt. g. "As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." Id.

> Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information. See ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F.Supp.2d 622, 688 (E.D. Pa. 2003) (tortious interference with contract); Albee Homes, Inc. v. Caddie Homes, Inc., 207 A.2d 771 (Pa. 1965) (inducement of another's employees); Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 635, 136 A.2d 838 (Pa. 1957) (trading on another's reputation); Goebel Brewing Co. v. Esslingers, Inc., 373 Pa. 334, 95 A.2d 523 (Pa. 1953) (trademark and trade name infringement).

Synthes (USA) v. Globus Medical, Inc., Civ. No. 04-1235., 2007 WL 2043184, at *9 (E.D. Pa. July 12, 2007). Arguably, however, this does not provide a carte

blanche common law avenue with which to address all unfair behavior.  <u>Mainardi v. Prudential Ins. Co. of America</u>, Civ. No. 08-3605, 2009 WL 229757, at *10 (E.D. Pa. Jan. 20, 2009).

Here, defendant's claim is based upon tortious interference and the notion that "plaintiff clearly sought to trade on Bank's reputation to the community by taking calls at the JSSB Montgomery Branch Office wherein she scheduled appointments for NVFS."  (Rec. Doc. No. 25, p. 45).  For the reasons discussed <u>infra</u> in Section IV.D, defendant's tortious interference claim will not be disposed of here.

In reference to defendant's claim that plaintiff traded upon its reputation, that point is anything but clear.  In fact, defendant provides no evidence with which to draw that conclusion.  On the contrary,  the record clearly indicates that plaintiff avoided discussing JSSB with her prospective clients.   That plaintiff scheduled appointments for her business from JSSB does not, by itself, denote that Baier traded upon JSSB's reputation.

As a result, defendant is not entitled to summary judgment on this claim.


C.  <u>Unjust Enrichment - Count III</u>

In Count III of its counterclaim, JSSB argues that it conveyed benefits onto

Baier for the purposes of benefitting itself, and that Baier was unjustly enriched when she availed herself of those benefits outside of the workplace. Plaintiff, however, largely ignores defendant's claim, only insinuating that she was not enriched by defendant's action.

A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." AmeriPro Search, Inc. V. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001). In order to sustain an unjust enrichment claim, "the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (citing Torchia ex rel. Torchia v. Torchia, 499 A.2d 581 (Pa. Super. Ct. 1985)). "Otherwise stated, '[t]he elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.' " McGoldrick v. TruePosition, Inc., No. 07-CV-266, 2009 WL 704387, at *3 (E.D.

Pa. Mar. 17, 2009) (quoting <u>AmeriPro Search, Inc.</u>, 787 A.2d 988) (alteration in original) (internal quotation marks omitted). The most significant question for an evaluating court is whether the enrichment of the defendant is unjust. <u>Stoeckinger v. Presidential Financial Corp. of Delaware Valley</u>, 948 A.2d 828, 833 (Pa. Super. Ct. 2008) (quoting <u>Styer v. Hugo</u>, 619 A.2d 347, 350 (Pa. Super. Ct. 1993)). An individual is not unjustly enriched just because she may have benefitted from the plaintiff's actions. <u>Stoeckinger</u>, 948 A.2d at 833 (quoting <u>Styer</u>, 619 A.2d at 350). "'Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred.'" <u>Novae Corporate Underwriting Ltd. v. Atlantic Mut. Ins. Co.</u>, 556 F. Supp. 2d 489, 496 (E.D. Pa. 2008) (quoting <u>Mitchell v. Moore</u>, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999)).

Although we acknowledge that plaintiff was undoubtedly enriched by defendant's actions, there remains a genuine issue of material fact regarding the allegedly unjust nature of that enrichment. Defendant emphasizes two distinct benefits in advancing its claim. First, defendant notes that it provided plaintiff with an insurance license at its own expense and that plaintiff subsequently used the license for her own benefit. While we agree that JSSB provided Baier with the license in 2001, (Rec. Doc. No. 25, pp. 2-3, ¶¶ 7-9), we fail to see any losses the

bank incurred in relation to Baier's insurance license .  Baier surrendered this license in December 2005, (Id. at p. 3, ¶11), prior to founding NVFS, and there is no indication that Baier employed the Bank-provided insurance license for any means other than the Bank's benefit from 2001 until the end of 2005.  It was not until after Baier obtained her own license in March or April of 2006, (Rec. Doc. 27-3, p. 13), that Baier would have had the opportunity to compete with JSSB in regards to insurance investments.  Therefore, because the Bank was the sole beneficiary of Baier's actions during the relevant time, the Bank has not shown that Baier unjustly benefitted from use of the license it provided.

Secondly, JSSB claims that Baier used the notary certification and errors/omissions coverage it provided to advance NVFS.  The Bank argues that plaintiff was aware that it paid for her notary certification and errors/omissions coverage solely to advance its own interests, and that she violated this intent.  While this may be true, it is irrelevant.  See Limbach Co., LLC v. City of Philadelphia, 905 A.2d 567, 577 (Pa. Commw. Ct. 2006) ("The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched; the intent of the parties is irrelevant.") (citation omitted).  The only question that we must address is whether Baier was unjustly enriched by the certification and coverage provided by JSSB.  We conclude that the evidence warrants a

determination that a genuine issue of material fact exists as to this claim.

Defendant recognizes that the notary designation and powers related thereto belong to the individual. Therefore, plaintiff was entitled to use them as she saw fit.  Furthermore, the Bank has not demonstrated that Baier's notary powers failed to benefit the Bank.  Although, Baier admits that she used her notary public powers for purposes unrelated to JSSB business, the Bank does not allege that she refused to bring her powers to bear for its benefit prior to the conclusion of her employment.  That plaintiff received something of value and used it to benefit herself, in addition to her employer, does not exhibit unjust enrichment.  Nor does the ability to continue to use the benefit after employment has ceased.  Ostensibly, defendant asks us to hold that plaintiff was unjustly enriched because she disregarded JSSB's desire that she only exercise her powers to espouse the Bank's interests.  We cannot grant summary judgment in favor of the defendant based upon that argument.

### D.  Tortious Interference with Contract - Count IV

Defendant contends that plaintiff's attempts to solicit financial services business away from the Bank constitute tortious interference with the prospective contractual relations between JSSB and potential customers.  Once again, plaintiff basically ignores this claim.

It is well settled that one who intentionally interferes with a prospective contractual or business relationship of another is liable for the harm thereby caused.  See Glenn v. Point Park College, 272 S.2d 895, 897-99 (Pa. 1971) (interference with a prospective contractual relationship is a tort long recognized at common law).  In order to establish that Baier tortiously interfered with JSSB's prospective contractual relationships, JSSB must establish: (1) the existence of a prospective contractual relationship between JSSB and a third party; (2) purposeful action on the part of Baier, specifically intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of Baier; and, (4) the occasioning of actual legal damage as a result of Baier's conduct.  Blackwell v. Eskin, 916 A.2d 1123, 1127-28 (Pa. Super. Ct. 2007) (citations omitted).

A "prospective contractual relationship" is "something less than a contractual right, something more than a mere hope."  Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979).  Under Pennsylvania law, JSSB must present adequate proof of "an objectively reasonable probability that a contract will come into existence."  Kachmar, 109 F.3d at 184.  JSSB need only demonstrate that it is reasonably probable that it would have obtained a contract, not that it was guaranteed to do so.  Alvord-Polk, Inc. v. F. Schumacher & Co., 37

F.3d 996, 1015 (3d Cir. 1994). Stated another way, JSSB may recover if, but for Baier's wrongful acts, "'it is reasonably probable that a contract would have been entered.'" Philadelphia Plaza-Phase II v. Bank of Am. Nat'l Trust & Sav. Assoc., No. 322, 2002 WL 1472338, at *5 (Pa. Com. Pl. May 30, 2002) (quoting SHV Coal, Inc., 545 A.2d at 921). "This reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties." Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 780 (E.D. Pa. 2007) (citation omitted) (internal quotation marks omitted).

According to the Bank, this prospective relationship is evident regarding both Duchman and Ertel. We disagree. The Bank claims that "[t]hese prospective customers initially contacted Baier at the JSSB Montgomery Branch . . . ." (Rec. Doc. No. 26, p. 43), but no evidence within the record supports this claim. Insofar as Duchman is concerned, his testimony at the Unemployment Compensation hearing and JSSB's statement of facts clearly indicate that he initially contacted Baier at home, using the phone number listed on the NVFS sign located in Baier's front yard. See (Rec. Doc. No. 25, p. 9, ¶¶ 52-53; Rec. Doc. No. 27-8, p. 38). And, other than Baier's statement that she did not solicit Ertel or any other individual while she was at work, (Rec. Doc. No. 27-3, pp. 177-78), there is a

dearth of evidence regarding Ertel's solicitation.

In essence, JSSB has not demonstrated more than mere hope in securing a prospective relationship with either Duchman or Ertel. Neither individual had any known prior or current dealings with JSSB and there were no unenforceable express agreements or offers in play here. The only contact Duchman had with JSSB (apart from their secretive business relationship) was a byproduct of Baier's request that he contact her at work. Ertel, on the other hand, never associated with the Bank at all. The Bank simply proffered no evidence to intimate that there was a reasonable probability it would contract with Duchman or Ertel but for the fact that it offers financial services. That is not sufficient to reasonably establish the existence of a prospective contractual relationship between the Bank and the alleged potential customers.

Consequently, because JSSB cannot establish the first element, we need not delve into the other three. Defendant is not entitled to summary judgment on this claim.

### E.  Specific Damages

Baier argues that defendant is not entitled to summary judgment on its breach of fiduciary loyalty claim because defendant has failed to prove specific damages. We disagree. Defendant correctly points out that "genuine issues on the

amount of damages" may be reserved for trial after an interlocutory summary judgment on liability.  Fed. R. Civ. P. 56(d)(2); <u>see</u> <u>also</u> <u>In re Park</u>, 271 Fed. Appx. 398, 401 n. 11 (5th Cir. 2008) (citations omitted).  Therefore, on Count I of defendant's counterclaim, we shall grant defendant an interlocutory summary judgment on liability and hold over the issue of damages for trial.


**CONCLUSION:**

For the foregoing reasons, we will grant defendant's motion for summary judgment in part and deny defendant's motion for summary judgment in part.


    s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY BAIER,                          :
                                     :
            Plaintiff                :          No. 4:07-CV-2236
                                     :
      v.                             :          (Judge McClure)
                                     :
JERSEY SHORE STATE BANK,             :
                                     :
            Defendant.               :

**O R D E R**

August 31, 2009

In accordance with the accompanying Memorandum,

**IT IS HEREBY ORDERED THAT:**

1.      Defendant's "Motion for Summary Judgment," as to plaintiff's Title

VII retaliation claim, is GRANTED.  (Rec. Doc. No. 24).

2.      Defendant's "Motion for Summary Judgment," as to Count I of

defendant's counterclaim, is GRANTED on liability.  (Rec. Doc. No. 24).

Damages shall be addressed at trial.

3.      Defendant's "Motion for Summary Judgment," as to Count II of

defendant's counterclaims, is DENIED.  (Rec. Doc. No. 24).

4.     Defendant's "Motion for Summary Judgment," as to Count III of defendant's counterclaim, is DENIED.  (Rec. Doc. No. 24).

5.     Defendant's "Motion for Summary Judgment," as to Count IV of defendant's counterclaim, is DENIED.  (Rec. Doc. No. 24).

6.     Defendant's motion to declare defendant's concise statement of undisputed facts admitted and/or strike portions of plaintiff's response to defendant's concise statement is DENIED.  (Rec. Doc. No. 38).

7.     The clerk is directed to defer entering any final judgment until final disposition of all claims.


       s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge